This time we'll hear MPM Silicones v. Union Carbide. Good morning. Good morning. Jonathan Ettinger for Appellant and Cross-Appellee MPM Silicones, LLC. MPM brought this suit seeking to recover costs it had incurred and will incur cleaning up polychlorinated biphenyls, PCBs for short, which the district court ultimately determined MPM never used and which were generated and disposed of wholly by defendant Union Carbide Corporation. The primary issue is whether the statute of limitations began to run on MPM's claim for response costs before it accrued and before MPM even existed, because Union Carbide Am I correct that you needed only less than a year of tolling in order to make the suit timely? I think that is right. The tolling agreement is in the record. If your diligence, if you did not have any failure of diligence for the period of the receipt of the Environ report in 2004 until 2006, that would make you timely. You don't need to have been doing diligence all the way up to... Well, UCC's argument is to the contrary and the district court found to the contrary. And the primary issue is whether the cleanup done by UCC under the RCRA statute decades earlier served as the one remedial action that would trigger the statute of limitations. So there is nothing in the statute or the case law that requires that result. The district court, however... And that started in 93, am I right about that? Actually, that started in the late 80s with an investigation and then there was some work, I believe, in 92 and then 93 and 94. So it's... Remediation started in 93, is that right? There was some remediation at each of those times. And for purposes of this case, it didn't matter whether it was 88, 92 or 94. But I think the district court did in fact... Well, in NYSEG you missed it by even a longer period of time. That's correct. And we didn't miss it because we didn't have anything, there was nothing we could have done. We didn't exist. We didn't have a cause of action at the time. You didn't own the property then either. Excuse me? You didn't own the property then either. We did not own the property. We had not conducted any work. So it is undisputed that we could not have brought a claim. And the district court felt constrained by this Court's decision in New York State Electric and Gas Company v. First Energy, NYSEG as everyone calls it. But NYSEG does not mandate the result the district court... NYSEG is an extraordinarily different circumstance. In NYSEG, the application of NYSEG to this case, in NYSEG the plaintiff does one remediation, which starts a limitation period going. And then that remediation was inadequate. So then it does another remediation, a subsequent remediation, and is contending that it should have another six-year period, if that's the period, beginning with the second. And the Court's ruling was that when you start the remediation, that starts the statute of limitation. You can't then do it again because of the inadequacy of the first and get a whole new period. That's very different from your case, where according to the defendant's contention and the district court's holding, the remediation, the period, the six-year period began to run when the defendant did its inadequate remediation with the consequence that you are untimely before you acquire the property. That is exactly right, Your Honor. And I think there's a further wrinkle in NYSEG where there was more than one site involved. I think in one of them they actually split up their remediation intentionally into different phases. How many sites do we have here? This is one site, Sistersville, West Virginia. But are you arguing that you get the six years starting to run when you purchase the property? Isn't that your view?  It should run under your view, then. We get the six years when we physically initiate on-site construction of a remedial action. By a new purchaser? Yes. So what if there's a subsequent purchaser to you and they do some remediation in five years? When does their six years start to run? Their six years starts to run when they physically initiate on-site construction because there's nothing in the statute. I understand how, and I think the Court understands how it got to the conclusion it did in NYSEG. That's because there was one party. I don't think you need to give that answer to Judge Droney's question. If a new purchaser acquires the property with knowledge that there is a remediation going on at that time, I don't think you need for your case to say that the six years begins anew with the new purchasers undertaking its own continuation of the remediation. I agree with Your Honor, but our premise is under the circumstances here, UCC could not start the statute of limitations running as against us by doing its remediation decades ago. Was the remediation for PCBs a new remediation? It was not. Excuse me, our remediation for PCBs? Yes. So the record is clear. Has there been any remediation of PCBs in the past? No. The Union Carbide corrective action that it did, and the judge made this finding, she did not go as far as we asked her to go in terms of the intent of Union Carbide, but she did make the finding that when Union Carbide reported to the Environmental Protection Agency what had been disposed of on the site, it conspicuously, the district court's word, avoided mentioning polychlorinated biphenyls. And that's why the corrective action did not include polychlorinated biphenyls. That sort of raises another line of inquiry, because maybe the best way to solve this is to say that it's really a matter of contract. Your client bought property. It could have gotten an indemnity. It could have gotten representations. If those representations were false, it could have sued on the contract. You'd have your six-year statute of limitations. Why shouldn't all of this be sort of massaged into an ordinary contract arrangement? You buy a thing that has apparel. You allocate the apparel by contract. A couple answers to that, Your Honor. First, we did not buy the property from Union Carbide. Correct me.  Okay. There was an intermediate owner. And while parties can allocate liability under CERCLA and as with other statutes, the case law is very clear that if you are to get a release, not the release in terms of the environmental language, a release in the contractual form from a party for CERCLA liability, you've got to be clear. You're releasing them for CERCLA liability. So parties can do that. The second answer to the ---- Well, I think the second answer, Your Honor, was that the parties were not familiar with the PCBs. General Electric did due diligence of this site when it purchased the property. They know a lot about PCBs. That is true, Your Honor. And the record is they hired a sophisticated environmental consultant to do the investigation, and the judge credited the testimony of Mr. Wood, who testified that when he hired them and when they gave him the information, the only information they had about PCBs that they thought was of any concern at all was that they had been used in connection with transformers and electrical equipment and that they did not expect to find hundreds of thousands of pounds, which is what it turns out they found. And if I understand correctly, and when Union Carbide did its remediation and got it approved by the EPA, the EPA was aware of the existence of some residual contamination consistent with what you were just saying, leakage from transformer equipment. That is correct. There was in the record low levels in the sugar camp run that no one thought was any concern. There was not in the filings by UCC with EPA, both under RCRA and CERCLA, they did not disclose that hundreds of thousands of pounds of PCBs had been used in manufacturing processes and routinely disposed of on the site. But the EPA had approved a remediation with notice of the existence of some residual contamination consistent with the notice that your client acquired from the environment for 10 years. That is correct. And so what I want to point out for just a moment is, with my limited time remaining, the NYSEG decision was never, as pointed out earlier, was not one party suing another party. It was a single party who split up his own cleanup. What I would say is if you look at Section 113 of CERCLA, which is the statute of limitations provision, and 107, Section 113 says that there must be an initial action for recovery of the cost referred to in Section 9607. That's 107 of CERCLA. Now, 9607 refers to liability incurred by any other party. So 113, when it refers to 107, is setting up a construct where you have to do a cleanup. Sorry. You have a statute of limitations based on your cleanup. When you incur costs, that's when you can sue another party. Even if there's no new spill. I mean, we can agree on that. There's no new. Even if there's no new spill. Because it's the same. It's the north inactive site. It has always been the same site. That's right. That's the site that was being remediated, but they found when they were doing some construction there, your client. Well, we found the PCPs not in the north inactive site. It was in the EQ or area. But then you found them in the north inactive site. It had been known that there would likely be some in the north inactive site. What's the extent of PCB existence in the north inactive site? We do not know. Still? We still do not know. Do you believe it's substantial? It's potentially substantial, but we do not know. Because it didn't come to light that potentially hundreds of thousands of pounds of PCBs were put somewhere. What we found was when we were building a wastewater treatment plant upgrade, we found in what was formerly known as the EQ basin. I could be wrong on that. But there was a specific area that was delineated, and that's where PCBs were found when they were never expected to be. And Mr. Heintzman confirmed what Mr. Wood said, and that's why the court said, I credit the testimony of Mr. Wood, that they had no idea at the time that PCBs were used in such large quantities. And was that at the north inactive site? It was not. We are not currently doing any work at the north inactive site. I see my time is up. Thank you. You have reserved rebuttal? I have. We'll hear you then. May it please the Court. I'm Hal Siegel, and I represent Appelli and Cross Appellant Union Carbide Corporation. If possible, I request to reserve, to the extent I have the time, two minutes for rebuttal on our cross appeal. Done. Go right ahead. What MPM is really asking this Court to do is rewrite the Circle of Statute of Limitations. The Statute of Limitations is not ambiguous. It's clear on its face. It states that the six-year statute runs after the initiation of the physical on-site construction of, in the statute's words, the remedy. MPM, a claim for remedial costs is time-barred because, as the district court found no later than 1994. You can have six or seven conditions on a single site, and then what's the remedy? And you could discover them seriatim. One year, then something else two years later, something else eight years later. You've got a gigantic site like this. 1,400 acres. I'm sorry. That's exactly what this Court addressed in the Niseg case. What the Niseg case was all about was whether the fact that remediation is taken at different times and also whether contamination that is not discovered initially years later has to be remediated constitutes all a single remedial action or whether somehow a remedial action can be broken up. And what the Court did in that case was looked at the very nature of what a remedial action is under CERCLA. It is a term of art under CERCLA. And what the Court found looking at the statute was that by its very nature, a remedial action is, as this Court said in that case, once and for all. Under the statute, remedial action is defined as those actions, among other things, that are consistent with a permanent remedy. That case didn't turn on discovery. The facts of Niseg are so extraordinarily different from this case that that ruling simply can't logically be applied to this case. The proposition of Niseg was that when one takes a remedial action and the statute begins to run, one incurs the cost, and then if later you find out that you didn't do a good job on it and you start and do a further remedial action to remedy the problems that you left with the first inadequate remedial action, you don't get a new start. But that has no logical application to a case like this where one party, the first party that owns the grounds, does some remediation, does it badly, and then two owners later eventually discovers that there are big problems and you say, sorry, when you bought this land, you were already untimely to recover costs for remediation. That simply makes no sense. Respectfully, Your Honor, Niseg actually is directly relevant to this case, and here's why. Niseg didn't just deal with the situation of a remedy being inadequate and having to expand it later. At the Oswego site, there were two different sites. There were actually three, but there was a particular site called the Oswego site, and what happened at that site was coal tar contamination was found, and the plaintiff engaged in remediation of that coal tar, and that was in a particular area of the facility. Years later, totally unknown contamination, contamination that was previously unknown, was found in a river, and it turned out that a previously completely unknown pipe had connected this site to the river, and the court said in Niseg it doesn't matter that the contamination wasn't previously known. It doesn't matter that the remediation was completely separate in time, and the reason for that is what the very nature of a remedial action is. Again, a term of art under this statute. It's by its nature once and for all. If it weren't that, it wouldn't be a remedial action. That's what Niseg is about, and that's why it's directly on point on this case. Sotomayor. Could there be more than one remedial action? I mean, assume that over here on the site, there's a bunch of barrels, and the prior owner puts a cap on top of them, and the barrels have coal tar, and then in the other corner of it, there's running slops when it rains, and it's a completely different substance, and so somebody has to build a ditch. Is that the same remediation? Under Niseg, it is. That is what this court ruled. That is what that case stands for, because what the case turns on is not the nature of the remediation, not whether it was only one party. The case literally does not turn on those things. It turns on the very inherent nature of a remedial action, and that by its nature, it's once and for all, and there can only be one remedial action at a site. That is what this court said. Even if it's deficient? Excuse me? Even if it's deficient. Even if it's deficient. In other words, if the remediation is deficient, and then there's a need for more, it's still one remedial action. The remedial action in Niseg may have been coal tar, but what if they found PCBs in another part of the same site? Just as at the Oswego site, they found previously unknown contamination. It was all coal tar. It may have all been coal tar, but the notion that it was previously unknown didn't make it less than one remedial action. In order to come to the ruling that MPM is arguing in an attempt to save its claim, it really requires overturning Niseg. It's not just distinguishing it, because it didn't turn on whether different contaminants were found or on whether different parties were involved. It was focused entirely on what the nature of remedial action is under CERCLA, just as in the Tenth Circuit. It wouldn't require even talking about Niseg if the principle were applied from TRW of tolling by reason of concealment. Well, Your Honor, I can address the concealment point. The district court specifically addressed the issue of equitable tolling. There is an equitable tolling doctrine that provides relief in extreme circumstances when a party is not compliant with the statute of limitations. And generally, it's a situation where a party is in a situation beyond its control and it's diligently pursued its rights. The district court found below. Beyond its control. I mean, it didn't buy the property until afterward. Well, the district court found below that the MPM actually raised that issue. Interestingly, they didn't see fit to raise it on appeal for good reason. The district court rejected that it would provide relief here because MPM began incurring remedial costs as soon as it acquired the site in 2003 because it took over the preexisting remedy at the north inactive site, the maintenance of the cap, the recovery well, the maintenance of the ditches. It didn't even file suit six years after that. I thought you were going to answer the concealment question. My recollection is the district court made a finding of fact that there was not enough evidence of concealment. Is that right? That's absolutely correct. Is that what you were going to say? That is one of the things I would have liked to have said, yes. The court did reach that finding. It also found that MPM at the time of the acquisition through that Environ report that was mentioned earlier, the due diligence report was on notice that Environ had reported that there were PCBs of unknown extent and not fully known origin at the site. They knew that when they acquired the site in 2003. There were PCB sampling hits all over the refinery, all in this area called the EP area. It's actually a small area, but it's the area at issue in this case. Those were all known to it. So MPM came in. It knew about the PCBs in 2003. It knew it was incurring remedial costs in 2003 when it took over the remedy. It did nothing. It did not bring suit by 2009, which was six years later. It didn't bring suit by 2010. It negotiated an agreement belatedly. The remediation it was doing was not for PCBs. That's correct. They haven't done any remediation to this day. The regulators have never required it, and they've held all the information. MPM has never done any PCB remediation directly, except I will say an exception to that, as was brought out earlier, is there were these issues about PCBs of unknown extent in the north and active site. And so that initial remediation did include PCBs in that area to the extent they were in that site. But they have not engaged in anything beyond that in any area of the facility. And getting to this diligence issue, you know, with respect to equitable tolling, so they had all this notice. They didn't bring suit on time. And then the district court found it significant that they were dilatory in other respects. They had all this information about PCBs, which they've accused Union Carbide of concealing. They waited years to give it to the state. They waited years. The court ruled that they violated their RCRA permit, actually, by not timely disclosing it. This is not a circumstance where equitable tolling could apply. That's the doctrine that might, a doctrine that might give relief from an overly harsh application of a statute of limitations. But it's not available to NPM here. The, accepting your view of NYSEG, which may be valid, but accepting your view of NYSEG, doesn't it set up some evil incentives? Because anybody who has or acquires a site just can start some cheap and dirty remediation process. And when they sell it six years later, seven years later, they're really off the hook. They have literally commenced a statute of limitations as a lawyer's initiative. That's not the real world, Your Honor. And one reason. Well, we don't live in the real world. Well, no, I respectfully think the court does in the sense that there was recognition earlier today and certainly recognition throughout the case law of commercial practice. And what happens, just as NPM did when it was GE, did very extensive due diligence, including with respect to PCBs, quite focused. About 143 sample PCBs were tested. But just as it did that, a commercial buyer typically does due diligence. So they will know if a remediation has started at a site. And so what happens in the commercial world is the parties allocate responsibility for cleanup. It's also giving environmental issues an inordinate focus to suggest that they are what motivates parties timing and selling a site. Parties, usually it's broad commercial considerations that motivate the sale of the site. To think that a party would put off a transaction in the value of millions or even billions of dollars just to run a statute of limitation is an extreme circumstance. And we really haven't seen that from what we can tell in the case law. So I don't think that's a realistic concern. I think commercial circumstances do take care of that, again, through contract negotiation and allocation. This won't be a situation where sites don't get cleaned up. It's just a question of how the responsibility is allocated. The market will take care of it. What MPM is really asking this Court to do is rewrite the Circular Statute of Limitations, which is plain and clear on its face. There's no reason to rewrite it, so that it could only begin to accrue once a party has a cause of action. It's very apparent on the face of the plain language of the statute that Congress intended just the opposite. It intended to have totally different time periods for the statute of limitations and for the accrual of a cause of action because they're both addressed in the same provision, virtually in the same paragraph, Section 113G2 of Circular States on the one hand. And your reliance is on the definite Article D, right? That's your principal statutory analysis, right? No, it's not. It does say the, and that was, for example, the Tenth Circuit saw that as highly significant with respect to the notion that there could only be one remedy. But in NYSEG, this Court took a much broader look, and it said, what is the real nature of remedial action under this statute? It noted the definition in CIRCLA that remedial action by its nature is actions consistent with, quote, and it didn't, this Court didn't hang its hat entirely on the word the. I do think that's one indication that there's only one remedy, but it's just a part of a much bigger picture. And so the statute has a, the cause of action runs from the incurrence of response costs. So MPM had a cause of action that ran from its incurrence of response costs in 2003, but Congress specifically has the statute of limitation running from the physical, initiating physical on-site construction, totally different points. Congress clearly intended to run the statute of limitations at a different point from when the cause of action arises. Hypothetically, just try to help me understand this. Yes, thank you. But what if you had a large site, been used industrially for decades or maybe a century, and it's owned by two different companies? It's one site. It's a Superfund site. And one of them starts remediation in one year, and the other one doesn't start until seven years later. How does the statute of limitations work? Well, in that situation, the second owner of the site, if it hadn't entered into some kind of tolling agreement, as might not be unlikely or a contract with the prior owner, would not be able to bring a claim with respect to, I mean, I'm not sure why that owner would want to bring a, in other words, it would not be able to bring a claim because the remedy had already begun at a site. And sometimes statute of limitations do cut off claims. I mean, that is the nature, and it reflects, as this Court ruled in Schaefer and as many courts have ruled, that evidence gets stale, and there is a value in finality. We're not looking at a statute of repose, and these things do go on for decades. So I hear your argument. It sounds very good. I'm not sure it's all workable. It is workable because it's true that the remediation may go on for decades, but a party, if it feels it has a cost recovery claim to be made, can bring an initial action within the statute of limitations period. And then if it goes on for decades, it could leave. The Court has any basis for a claim before it has incurred costs or owns the property? No, it can't do that. It even exists? It can't do that. An operation that didn't exist during the time of the running of the statute, as you see it? That's correct. There could be a situation. That is the situation in this case. However, a party can deal with that contractually. By the way, MPM did deal with it contractually. They negotiated an indemnity with the company from which they purchased Crompton, which covered preexisting contamination. That's what parties do. The second owner in the hypothetical who began remediation could enter it. So what are you doing here if Crompton has issued the indemnity? Your Honor, that's a huge question. What are we doing here? And we wouldn't be here if MPM, well, we believe that MPM could properly enforce its indemnity claim. We shouldn't have to be here. MPM did not enforce its indemnity or chose not to? Well, there were issues because MPM did not, Crompton, which later became another company, didn't feel that MPM had timely raised its indemnity claim. Another example, by the way, of a lack of diligence when we spoke about equitable tolling. They didn't timely inform Crompton. The other issue here is MPM admits that it has not engaged in any PCB remediation beyond what's going on at the North Inactive site. I don't know what will happen if they raise that claim. They could have raised a claim, I suppose, because they were incurring the costs relating to the North Inactive site. And there are some limits that they commercially agreed to in the indemnity. We don't think that MPM has taken steps properly to enforce that indemnity, and that's why they sued Union Carbide. Can I just ask you about the RCRA permit? Yes. The effect of it in Section A, Part 1, Section A, it says, this permit authorizes only the management of hazardous waste expressly described in this permit and does not authorize any other management of hazardous waste.  Not necessarily, particularly because of the nature of the corrective action here. It covers the whole North Inactive site, for example, regardless of whatever contaminants are there. And there were descriptions that were provided to EPA that provided more general descriptions of the kinds of waste at the site. So it was a broadly applicable permit. And there had been data provided to EPA about PCB detections and sediments in the sugar camp run, as well as about the historic disposal. We'll hear you again on the cross-appeal. Thank you very much. I have a question to ask you about your adversary's response relating to concealment with respect to Union Carbide. Your adversary, if I understood him correctly, said that the district court had found that there was no concealment. A couple of questions. One is, it was my impression that the district court's finding was a little different, that there was insufficient evidence of willful fraud with respect to concealment, but that there had been concealment of 250,000 pounds of PCBs. And the second question is, to the extent that the district court made that finding, is that finding a sustainable finding in view of the burial of 250,000 pounds of PCBs and nondisclosure of it? What the district court found after trial, because this was an issue presented at trial in the context of the equitable allocation, the district court found that although Union Carbide, I think she used the word intentionally, I know she said conspicuously did not include PCBs in its written filings with EPA under the RCRA Corrective Action Program, and under the CERCLA 103 Notification of Hazardous Waste, they didn't check the box for PCBs. I think she found that was intentional, but we urged her to find, sorry, she found that that was not disclosed. She didn't find that the concealment was intentional. What she found was there wasn't sufficient evidence because there was no one around who was involved at the time, and she couldn't make a determination on that. Willfulness. Insufficient evidence of willful fraud. Yes. Yes. And she based that on the fact that there were no live witnesses who could actually explain it, given the passage of time. She did find that there had been a failure to disclose. Yes. She used the word that it was concealed. I do not recall that she uses the term conspicuous. She refers to a memorandum that was written internally that was essentially cut and pasted into a notification for EPA that listed nine different categories of hazardous waste disposal on the premises. And the only one missing was these PCBs. And then she said that was conspicuous in its absence. And we did urge to find that it was intentional and, therefore, was an equitable factor to be used against union carbide. Of course, she did find 95% of the responsibility was union carbides, so I think we were not disappointed with that result. The Court was talking about, excuse me, Mr. Siegel was talking about NISEG and the remedial action being once and for all. I want to make two points about NISEG and how it relates. First, the Supreme Court said in Ryder that Congress can certainly cut off someone's rights under a statute of limitations if they want to before their claim actually accrues, but it would be an odd result and you shouldn't construe statutes unless Congress had made that clear. Congress certainly, in this case, hasn't made that clear. Now, in NISEG, with the remedial action being a one-time, once-and-for-all, the Court was talking about the incentives for the parties to do a proper cleanup. And you shouldn't reward might be the wrong term, but I'll say reward. You shouldn't allow a party to have a benefit if they do a haphazard cleanup or not a comprehensive cleanup, because the incentives in the statute are to encourage people to do the right cleanup. Here, exactly the opposite incentives are in play, because it was UCC that did the cleanup that did not include PCBs years ago. And applying NISEG to allow that to cut off the statute of limitations for MPM provides an incentive for parties to do a less-than-thorough cleanup. And it is not speculation to say parties would likely read such a decision and say we should do a cleanup at every site, but we don't have to do a really good cleanup. And then once we sell the property years later, we'll be fine. This is a great risk management strategy. I don't think that is far-fetched to suggest. In terms of the construction being initiated in 2003, there was a suggestion that it might be read to suggest the statute of limitations would have run in 2003. CERCLA says that the statute of limitations on remedial actions begins to run at the initiation of physical on-site construction of a remedy. So that was not 2003 when we discovered PCBs. It was not when we continued to operate RCRA corrective action units or anything like that. None of that is physical on-site construction of a remedy. As for the Crompton indemnity, which is the final issue that came up, we did, in fact, negotiate an indemnity. We've not been able to collect on it because Crompton refused to pay. So when you talk about whether there should be some, should have been some presumption that we dealt with the PCB, potential for PCB contamination in the purchase, and therefore we got a discount on the purchase price, which is one of the allegations, that's inconsistent both with the testimony and the judge's finding, as well as the fact that we got an indemnity from Crompton. It just wasn't good enough. We can't collect on it. We haven't been able to collect on it. And the judge said, of course, the district court judge said, of course when you go to collect your future response costs, you can't double recover. We can't double recover. If we do succeed in getting some money from Crompton, obviously we can't get it from UCC. So far we haven't. Thank you. Thank you. I would like to turn to the issue that we raised, one of the issues we raised at our cross appeal, which was the issue of the court's allocation. It's subject to an abuse of discretion standard. And a court does abuse its discretion when it fails to weigh important factors or relevant factors without explanation. The court found that when MPM acquired the site, it was on objective notice of PCBs found in multiple samples by its due diligence consultant. That may be a factor, but another factor was who put the PCBs there. Well, and what they also had. That was a major consideration. And you would have to argue that that's an abuse of discretion to weigh that heavily. Actually, the point here is also that they had in their possession, MPM, a memo from Union Carbide that said that up to 250,000 pounds of PCBs likely were disposed of somewhere. At the facility, they weren't sure whether it was at the north inactive site or elsewhere. MPM, GE, and GE is probably the most knowledgeable company in the world about PCB cleanup, Hudson River, Housatonic, others. They had a memo telling them up to 253 pounds were disposed of on site. They had a due diligence report telling them that there were PCBs of unknown extent and not fully known origin at the site. Now, the court found that. The district court found that, and yet it didn't weigh that in the allocation. It said that MPM, an MPM employee said, well, he thought they were from Transformers. That, of course, begs the question of how extensive they were or the objective notice. The court found that MPM was a, quote, sophisticated buyer and for good reason given that it was GE at the time, one of the most sophisticated in the world about PCBs and commercial transactions. They were selling a business with plants all over the place. This was just part of a much larger transaction. And they did negotiate an indemnity, and the court found, as counsel recognized, that the indemnity could be relevant in allocation. But the court, the court said, but I can't decide that now, and so ignored it in the actual allocation without any. Sotomayor Your argument is about the weight given to a valid consideration. Well, in this case. That usually gets folded into an exercise of discretion. You weigh this, you weigh that. Well, it was. But with a result. Lack of explanation about the failure to consider some of these factors. There's discretion about weight, but there has to be an explanation if they're not considered. The broader issue about declaratory relief is that it's unripe in the first place. Under the Supreme Court's stand, the Supreme Court has recognized that Congress would enact statutes is, is subject to constitutional standing requirements to a case in controversy requirements. And the test there for a future injury, which is what the allocation goes to here, is whether the future injury is certainly impending. The injury in this case was removal costs. The court specifically declined to find whether removal costs would ever be incurred. The court did rule that response costs, which could be either remedial or removal, she didn't specify whether removal or an issue here were, quote, likely, but she applied the wrong standard jurisdictionally. The correct standard is certainly impending, likely is a much lesser standard. So the more fundamental issue about the allocation is that it was unripe, the liability was unripe in the first place. MPM argues, well, CERCLA has a mandatory declaratory relief provision, not for allocation but for liability, but that has to be read in the context of the Constitution. Do you think it's not likely that MPM is going to have future costs responding to the PCBs? There is no demonstrated likelihood of future costs for removal and perhaps anything relating to PCBs in the sense that to this very day, years after 2003 when MPM was first on notice, years after 2008 when it said it encountered PCBs while excavating at the refinery, it hasn't done any remedial work. It hasn't done any removal work. It hasn't done anything. But the contamination is there. Yes, but the mere presence of contamination is not the injury under CERCLA. The mere fact of buried PCBs is not in itself actionable. We're not talking about their recovering for costs they don't incur. If they don't incur them, there's nothing to allocate. If they don't incur them, then they don't have a claim for declaratory relief. If there's no likelihood that it's demonstrated, if it's not demonstrated that it's certainly impending, then how could it be certainly impending when they've done nothing in all these years? And it's important to understand what the nature of the remedy is under CERCLA. The nature of the remedy is costs, recovery of costs. And the mere presence of contamination is not the injury for which CERCLA provides recovery. Thank you. Thank you, Your Honor. Thank you both. We will reserve decision.